UVALDE ASPHALT PAVING COMPANY, Respondent, *v.* THE CITY OF NEW YORK, Appellant.

First Department, May 13, 1921.

**Contracts — action to recover damages for breach of contract for construction of street based on interferences and delays — evidence — letters containing self-serving declarations improperly admitted — statement by court that jury should disregard self-serving part did not cure error — other contracts which interfered with work not admissible — no damage allowable for interference contemplated by contract — hearsay evidence — damages must be based on quantum meruit of increased cost in consequence of interference — improper rule adopted.**

In an action to recover damages for breach of a contract for the construction of a street it was error to permit plaintiff to introduce testimony as to the particular place where it planned to commence the work as the contract specifically provided where the work was to be commenced.

It was error for the court to permit the introduction of letters on behalf of the plaintiff containing self-serving declarations, and the general statement of the court that the jury should disregard such parts of the letters as were self serving did not cure the error.

The contract provided that in case delay should be caused by the precedence of other contracts no claim for damage should be made or allowed, and it was error to permit the introduction in evidence of such other contracts which caused delay in the absence of any showing in reference to each contract that the defendant unreasonably did some act in connection therewith whereby the plaintiff was delayed in its work or put to increased expense.

The plaintiff could not claim damages from delay caused by the letting of contracts for transverse roads on the ground that such contracts were not contemplated by the parties, for chapter 130 of the Laws of 1895 authorizing the construction of the street in question specifically provided for the construction of the transverse roads, and, furthermore, the plaintiff itself bid on the construction of some of the roads.

It was error to permit one of plaintiff's witnesses to testify as to conversations with plaintiff's superintendent, since deceased, as to what the decedent had said to or as to conversations he had had with defendants' officers or agents.

It was error to admit in evidence on the question of damages testimony by the plaintiff's employees and expert witnesses and memoranda prepared by them, to show the actual and estimated cost of construction according to the way the witnesses thought the street should have been constructed, ignoring the fact that the contract provided specifically as to the manner of construction.

In a case where a contractor has complied with the improper demands of the owner under protest and completed the contract, the damages are to be based upon a *quantum meruit* of the increased cost incurred in consequence of the unwarranted interference, and so in the instant case it was incumbent on the plaintiff, in every instance where it claimed that the city had unjustly interfered with its work or omitted to do something which it was obligated to do, to show, first, that there was such unlawful interference or improper action taken or omitted by the city, and then to establish by competent evidence what loss it sustained by reason of the given act of interference or wrongdoing.

The rule adopted by the trial court by which the damages were to be measured by the difference between the actual cost of the work and the estimated cost under an estimate based on a method different from that specified in the contract and ignoring the fact that no damages could be claimed for some of the interferences and delays, was erroneous.

APPEAL by the defendant, The City of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 20th day of November, 1919, on a verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the same day denying defendant's motion to set aside the verdict and for a new trial made

upon the minutes, and granting plaintiff's motion for an additional allowance.

*James A. Donnelly* of counsel [*John F. O'Brien* and *Henry J. Shields* with him on the brief; *John P. O'Brien, Corporation Counsel*], for the appellant.

*Edward M. Grout* of counsel [*Dean Potter* with him on the brief; *Edward M. Grout* and *Paul Grout,* attorneys], for the respondent.

GREENBAUM, J.:

This action arises out of a contract made between the parties on September 11, 1902, for the construction of the Grand Concourse from One Hundred and Sixty-first street to Mosholu Parkway in the borough of The Bronx. The complaint sets forth two causes of action: the first for moneys alleged to have been earned under the contract, and the second for damages for the defendant's alleged breach of the contract.

The trial court directed a verdict for the plaintiff as prayed for in the first cause of action for the full amount thereof with interest, making a total of $42,484.43.

So far as the appeal relates to that part of the judgment which resulted in a direction of a verdict by the court upon the first cause of action for $28,364.90 with interest, making a total of $42,484.43, we are of opinion that the court was justified in so directing the jury.

In respect of the second cause of action, however, an entirely different situation exists. The record of the trial is an exceedingly voluminous one.

The second cause of action is predicated upon various alleged breaches of the contract during its performance, on the part of the defendant, in that it " failed and neglected to prepare and furnish necessary detailed plans to plaintiff as required by said contract and furnished erroneous and faulty plans; refused to permit plaintiff to make suitable foundations for the viaduct; * * * and failed and neglected to give proper stakes and grades for said work; and failed to procure and give to plaintiff at the proper time permits to do certain portions of said contract work; failed and neglected promptly to procure as required easements necessary for the proper per-

formance of said contract; interfered with the plaintiff's work by the performance of work independent of said contract by its own subordinates and through independent contractors; arbitrarily revised and changed the plans and portions of said work; refused to permit plaintiff to perform the work in the manner contemplated by the contract; refused and neglected to give plaintiff possession of the site of the whole work; constructed, and permitted the construction of, various numerous sewers and water mains throughout and on the site of the work, and permitted the said work to be delayed and failed to complete it or to require it to be completed within the contract periods or within a reasonable time thereafter; required plaintiff to do work not called for by its contract but covered by said contracts of independent contractors; required plaintiff to do again work which had theretofore been duly and properly performed by it; refused and neglected to remove obstructions from the site of the work which it was defendant's duty to remove or to require to be removed; constructed transverse roads and viaducts across and under the site of plaintiff's work, thereby obstructing it and cutting it into separate sections and preventing plaintiff from proceeding with said work as a unit, and from transporting and depositing available excavated material from one portion of the work to another; and damaged and destroyed work performed by plaintiff, necessitating the doing of said work again."

It was alleged that by reason of the foregoing acts of commission and omission on the part of defendant, the work of completing the contract was made more expensive by the sum of $464,416.29, for which sum as damages judgment was demanded by the plaintiff. By its bill of particulars the plaintiff limited its claim to the sum of $376,376.93, for which amount the jury found a verdict in favor of the plaintiff. The defendant's answer, after general denials, set up, (1) payment; (2) that the plaintiff exceeded by 129½ days the contract allowance of 1,000 working days within which to complete the contract, for which excess the defendant would be entitled to liquidated damages amounting to $6,475; (3) that the contract authorized the letting of other contracts, and that any delays that were caused by the letting of said contracts were provided for by the contract and were within the contemplation of the

parties; (4) that the contract authorized the suspension of the work in the interest of the city and that the work was suspended; (5) that plaintiff released the defendant from all claims, and (6) as a counterclaim, that plaintiff failed to make repairs to the work called for under the contract amounting to $43,110. The contract is not for a gross sum. It is what is known as a unit price job, that is, to be paid for at specified unit rates for the different kinds of materials furnished and of work performed.

The contract was awarded the plaintiff as the lowest public bidder. The proposals for estimates contained *inter alia* the following provisions: " Grading of the Grand Boulevard and Concourse, from East One Hundred and Sixty-first Street to Mosholu Parkway and constructing temporary roadways, sidewalks and paths. * * * The time allowed for the completion of the whole work will be 1,000 consecutive working days. The time so allowed refers to consecutive working days and not to the aggregate time of such inspectors as may be appointed on the work. * * * Bidders must satisfy themselves by personal examination of the location of the proposed work and by such other means as they may prefer, as to the accuracy of the foregoing engineer's estimate. Bidders must also determine for themselves the probable amount of sinkage, shrinkage or settlement, and allow therefor, and shall not, at any time after the submission of a proposal, dispute or complain of such statement or estimate, nor assert that there was any misunderstanding in regard to the depth or character of the excavation and filling to be made or the nature or amount of the work to be done. * * * Bidders are specially notified that the President of the Borough reserves the right to determine the times and places for commencing and prosecuting the work, and that postponement or delay on the whole, or any part thereof, occasioned by the precedence of the other contracts, which may be either let or executed before or after the execution of the contract for this work, cannot constitute a claim for damages, nor for a reduction of the damages fixed for delay in completing the work beyond the time allowed."

The agreement signed by the respective parties defines the word " engineer " whenever used in the specifications or in the contract as the " engineer designated by the President to

act in the premises, limited to the particular duties intrusted to him." Other provisions material to the consideration of this appeal are the following: " The contractor agrees that the amounts and quantities of materials to be furnished and the work to be done, as stated in the proposals for estimates for the said work, are approximate only; that he is satisfied that the foregoing estimate of quantities is sufficiently accurate to determine the prices according to which he will do the work required by this contract in accordance therewith; and that he shall not and will not at any time dispute or complain of such statement, nor assert that there was any misunderstanding in regard to the depth or character of the excavation to be made or the nature or amount of the materials to be furnished or work to be done; and he will complete the entire work to the satisfaction of the President, and in accordance with the specifications and the plans therein mentioned, and that he will not ask, demand, sue for or recover for the entire work any extra compensation beyond the amount payable for the several classes of work in this contract enumerated, which shall be actually performed at the prices therefor herein agreed upon and fixed. * * * No inspection, approval or acceptance of any part of the work herein contracted for or of the materials used therein, or any payment on account thereof, shall prevent the party of the first part from objecting to the acceptance of the work or materials at any time thereafter during the existence of this contract."

" (D) To prevent all disputes and litigation the Chief Engineer shall in all cases determine the amount or the quantity of the several kinds of work which are to be paid for under this contract, and he shall determine all questions in relation to the work and the construction thereof, or the materials employed therein, and he shall in all cases decide every question which may arise relative to the execution of this contract on the part of the contractor and his estimate and decision shall be final and conclusive, and such estimate and decision in case any question shall arise, shall be a condition precedent to the right of the contractor to receive any money under this agreement."

" (F) The contractor will begin the work herein agreed to be performed on such date as the President shall notify him

to begin. The time hereinafter fixed for the completion of the work shall begin to run on and from the date so notified. The place where the work is to be begun will either be stated in said notice or designated on the ground by the engineer or inspector. * * * The contractor will carry on the work with such force and in such manner and order, and at such times and seasons as may be directed by the engineer. He will execute all the work in every respect in a thorough and workmanlike manner; and he will fully and entirely perform this contract on his part before the expiration of 1,000 consecutive working days. In the computation of the number of consecutive working days, the length of time (expressed in days or parts of days) during which the work or any part thereof has been delayed in consequence of the condition of the weather, or *by any act or omission of the party of the first part* [Italics ours] (all of which shall be determined by the President, who shall certify to the same in writing, and whose determination and certificate thereof shall be binding and conclusive upon the contractor), shall be allowed to the contractor and excluded from said computation. Sundays, and also all holidays on which no work is done, shall also be and shall be deemed to have been excluded from said computation. No demand by the contractor that the President determine and certify the matters aforesaid shall be of any effect whatsoever unless the same be made in writing and duly served upon the President, prior to the filing in the office of the Comptroller of the City of New York of the final certificate of the completion and acceptance of the work. * * * But neither an extension of time, for any reason, beyond the date fixed herein for the completion of the work, nor the doing and acceptance of any part of the work called for by the contract, shall be deemed to be a waiver by the President of the right to abrogate this contract for abandonment or delay, in the manner as provided for in this agreement."

Subdivision (G) provides for the payment of fifty dollars as liquidated damages for the delay of completion for each and every day, " the time here before allowed for that purpose * * *. If, before the completion of the work contemplated herein, it shall become necessary to do any other or further work on or about this regulating, etc., than is provided for

in this contract, the contractor will not in any way interfere with or molest such other person or persons as the President may employ to do such work, and will suspend such part of the work herein specified, or will carry on the same in such manner as may be ordered by the President, to afford all reasonable facilities for doing such work, and no other damage or claim by the contractor therefor shall be allowed, except such extension of the time specified in this contract for the performance thereof as the President may deem reasonable.  *  *  *

" (S) The President shall have the right to make contracts, and construct and repair, and to grant permits to construct or repair any sewer or sewers, and to grant permits for house connections with sewers or drains in the streets; also the right to grant permits to reset or renew any frames and heads of Croton water or gas stop-cocks, or to lay gas or water pipes or to construct necessary appurtenances in connection therewith, and to grant permits for house connections with water and gas pipes in the streets or *for any purpose* [Italics the court's] at any time prior to the completion of the work embraced in this agreement, and the right of suspending the work embraced in this agreement, or any part thereof, at any time during the progress of the same *for the purpose or purposes herein stated or for any other purpose,* [Italics ours] without other compensation to the contractor for such suspension than extending the time for completing the work as much as it may have been, in the opinion of the President, delayed by such suspension, and the contractor shall not interfere with or place any impediment in the way of any person or persons who may be engaged in the construction or repair of such sewer or sewers, or in making connections therewith, *or doing other work above specified.*"

Among the specifications forming a part of the contract in detailing the work to be done are the following: " Laying cross-walks where required; grading approaches to intersecting streets and avenues;  *  *  *  constructing an arch and approaches at East 175th Street and Morris Avenue, and work incidental thereto; lowering and raising all street monuments to the proper relative height in regard to grade.  *  *  *

" 10. The work under this agreement shall be prosecuted

at and from as many different points, at such times and in such part or parts of the streets and avenues on the line of the work, and with such force as the President by the engineer may, from time to time, during the progress of the work, determine; at each of which points an inspector or inspectors may be placed to supervise the same. Should postponement or delay be occasioned by the precedence of other contracts on the line of the work, which may be either let or executed before or after the execution of this contract, no claim for damages therefor shall be made or allowed.

" 11. In the progress of the work the contractor will be required to afford the necessary facilities to the company or companies owning rail tracks on the line of the work, or to their agents, in the preservation of the same from injury, either by removal or otherwise, without charge therefor. In case it be necessary to remove the said tracks or any portion of them, the said company or companies will be notified by the President to remove the same within a specified time, and the contractor shall not interfere with the said tracks, or any portion thereof, until the expiration of the time specified in said notice. * * *

" 14. * * * · The prosecution of the work or any part of it shall also be suspended at such other times and for such periods as the president may from time to time determine; no claim or demand shall be made by the contractor for damages by reason of such suspensions in the work, but the periods of such suspensions will be excluded in computing the time hereinafter limited for the completion of the work. During such suspensions all materials delivered upon but not placed in the work shall be neatly piled or removed, so as not to obstruct public travel.

" 15. Any incumbrances or obstructions which may be upon the line of the work when it is begun, or may thereafter be placed there, shall if directed by the engineer, be removed by the contractor at his own expense. * . * *

" 19. At all intersecting streets or avenues so much of the existing roadways, pavements, sidewalks, curb, gutter, flagging and cross-walks as may be directed by the engineer, shall be properly adjusted to the work under this contract, making safe and easy approaches. * * *

" 21. All loss or damage arising out of the nature of the work to be done under this agreement, or from any unforeseen or unusual obstructions or difficulties which may be encountered in the prosecution of the same, or from the action of the elements, shall be sustained by the contractor aforesaid.   *   *   *

" 103. No unnecessary interference with public property will be allowed, and such portions of the roadway as directed shall be macadamized at one time, leaving the remaining portions open, clear and in good condition for travel.   *   *   *

" 157. If it should be necessary to complete the grading at the temporary railroad south of East 204th Street, before said railroad is abandoned, a trestle will be built over the same according to plans and specifications to be furnished by the engineer."

The concourse to be constructed was four miles in length and 182 feet in width.   A description of the territory through which the concourse was to be built was given by the defendant's chief engineer as follows:  " The Concourse was laid out on a ridge between Jerome Avenue and about midway between Jerome Avenue and Webster Avenue, and extended from 161st Street to Mosholu Parkway on the north.  It was laid out for the purpose of connecting the principal part of Manhattan — the drives of the upper part of Manhattan with the Parkways of the Bronx.   It was almost virgin territory and was quite irregular, and, being over a ridge, it required a great deal of excavation and embankment in order to bring the surface to easy grades.   161st Street was an important street at the southerly end; in fact, it is the only street with a moderate grade between 149th Street and 177th Street or Tremont Avenue.  At 175th Street there was an extensive depression extending about 800 feet on the centre line of the Concourse and its depth is about 50 feet below the grade of the Concourse and, I think, about 75 or 80 feet below the highest point on the Concourse, the natural surface.  At Burnside Avenue there was a depression of about 10 feet, Burnside Avenue having been graded across some years before and paved, and a trolley track was operated thereon.  At 204th Street there was a large depression about 30 feet below the grade of the Concourse and about 10 feet south of that street

as laid out on the final map there was a railroad right of way, which was formerly used by the Jerome Park and Villa Site Company. * * * From 204th Street to the northerly end of the Concourse was approximately * * * 1500 feet. * * * North of the Kingsbridge Road was an extensive pile of rock * * * [running] from zero * * * to 12 or 15 feet " in height.

The notification by the defendant for the commencement of the work was given on October 2, 1902, and the place for commencing the work was fixed at One Hundred and Seventy-fifth street. Instead, however, of beginning at One Hundred and Seventy-fifth street, the plaintiff started the work at One Hundred and Seventy-third street. The contract was completed on November 13, 1909. The general superintendent representing the plaintiff on the work in question was one George Clark, who died in April, 1909.

The first witness called in behalf of plaintiff was Ralph T. Rokeby, the president of the corporation, who admitted that he was not an engineer. His duties in respect to the company were those of an executive. He testified that the city's engineer directed the work to be begun at One Hundred and Seventy-fifth street, but that as matter of fact it was begun at One Hundred and Seventy-third street. At the outset of his testimony he was asked what was the general plan which the plaintiff company mapped out for the prosecution of the work. The defendant's counsel objected to any such testimony upon the ground that the contract provided that the times and places and manner in which the work was to be done were under the direction of the defendant's chief engineer. He was, however, permitted to state over the objection of the defendant that " our plan — the company's plan was to start exactly where we did. * * * Our intention was to take the good rock and find a place there to build a road to it, a railroad and take the rock, cut it and have it handy to put in the bridge abutment." At another place this witness testified that the " general plan that we had, our two engineers and myself, was to start here immediately and at both ends to connect up with the railroad from each end," and that he visited the job about once a week, usually on Saturdays at about one o'clock, when he would drive over the work with

a horse and wagon accompanied by the superintendent Clark. It was thus evident that, while he was familiar in a general way with what was going on during the progress of the work, he was not in a position to testify with any definiteness as to the details of the alleged delays and· the consequences occasioned thereby.    Moreover he lacked technical knowledge as to many of the matters which were involved in the construction of the Concourse.    Notwithstanding this, and despite that his knowledge of what was done is largely based upon hearsay, a mass of correspondence was permitted to go into evidence as though it was that of the witness, much of it embodied in letters written by the deceased Mr. Clark, which contained self-serving declarations of the ˙plaintiff.    Although these letters were objected to, they were nevertheless admitted with a general statement on the part of the court that the jury would not pay attention to such portions of the letters as were self-serving.    Such an admonition might perhaps have been sufficient in an isolated case where the court specially pointed out an incompetent statement and directed the jury to disregard it.    But it is evident that where numerous letters containing· self-serving declarations are admitted in evidence, the jury would scarcely be in a position to differentiate between the competent and incompetent portions of the letters,˙ and that they would give scant heed to casual observations of the court during the course of the trial that they are to disregard such portions of the letters as offend the rules of evidence.    Under such a procedure the jury were constituted the judges of what was and was not self-serving.

Letter after letter admitted in evidence was open to the criticism that it contained self-serving declarations.    Some of them referred to alleged complaints of property owners said to have been made as to the delay in prosecuting the work.

That counsel for the defendant repeatedly objected to the introduction of these letters appears from the following colloquy:  " Mr. Donnelly: I do not want to have the jury get the impression by sitting here and allowing this line to go in evidence which states only a series of assumptions — The Court: Anything in a letter declaratory of an existing state of facts is not proof of facts existing.    Mr. Grout: Unless the letter is responded to by the other side.    The

Court:. Admitting the fact.    Mr. Grout: Or failing to deny
it.    The Court: But the letter of itself does not prove any-
thing except that it was sent."    In other words, the plaintiff
in this way got before the jury a mass of self-serving
declarations, which must have had the effect of impressing
the jurors that such general statements were tantamount
to evidence of the facts therein mentioned.    There were also
many contracts into which the city had entered with various
contractors in respect of such matters as sewers, building of
transverse roads, etc., which were admitted in evidence over
objection, without showing their relevancy.    In this con-
nection it should be borne in mind that the contract between
the plaintiff and defendant provided as follows: " Should
postponement or delay be occasioned by the precedence of
other contracts on the line of the work, which may be
either let or executed before or after the execution of this
contract, no claim for damages therefor shall be made or
allowed."

The introduction of these contracts must necessarily have
tended to impress the jury with the idea that the defendant
had no right to enter into such contracts and that. the plain-
tiff was thereby delayed in the prosecution of its work for
which it was entitled to be compensated.    Of course, in
respect to any given contract, if it were shown that the defend-
ant unreasonably did some act in connection therewith whereby
plaintiff was delayed in its work or put to increased expense,
there might be propriety in allowing that contract in evidence.

One of the claims for damages made by the plaintiff is
based upon the fact that the defendant awarded contracts
for the construction of transverse roads, which it was claimed
had the effect of delaying the plaintiff in its operations and ·
interfering with its work, the ground of such claims being
that it was not contemplated by the parties when the contract
in suit was given to the plaintiff that such transverse roads
would be built.    In this connection, it should be observed that
the construction of the Concourse was expressly authorized
by legislative enactment by chapter 130 of the Laws of 1895,
entitled, " An act to lay out and establish a grand boulevard
and concourse, together with not more than fifteen roads run-
ning transversely underneath said boulevard, in the city of

New York." It was, therefore, a matter of common knowledge and it may fairly be presumed that the plaintiff knew when it made its contract with the city that a part of the construction of the Concourse contemplated the building of a number of transverse roads. Indeed the cross-examination of Mr. Rokeby elicited that the plaintiff had submitted bids for two of the contracts for the construction of transverse roads.

The next witness called by plaintiff was James P. Donovan, a contractor who worked for the plaintiff from October 2, 1902, to July, 1905. This witness was asked whether he had had any talk with Mr. Clark, the plaintiff's superintendent, as to what the plaintiff's plan was for doing the work, and over the objections of defendant's counsel he was permitted to answer that " we arranged to start at One Hundred and Seventy-third street and work both ways, north and south, * * * with horses and trucks until the time that we could place railroad and rails." This conversation with Mr. Clark clearly was inadmissible.

The next witness called for the plaintiff was one Ferdinand C. Ryder, who was employed on the Concourse job by the plaintiff from 1904 to 1908–1909 in the capacity of foreman. It appears from his testimony that there were several gangs of men at work, each gang consisting of twenty-five to thirty men. This witness testified as to where the excavated material was dumped near One Hundred and Seventy-third street, and to the alleged interferences of the city's inspectors with dumping at that place. He worked at different parts of the job from time to time and he left the work during a portion of the earlier period of his employment and returned sometime in 1905.

The next witness was one Edward F. Ehrlich, who was in the plaintiff's employ commencing in the spring of 1907. This witness estimated the cost of taking up and restoring the curb and flagging, which he said had been destroyed or injured by the sewer contractors, at the sum of $8,020.20. He also estimated the cost of restoring the gutters due to the same cause at $7,511.14, and some other minor items. He testified that he had personal knowledge of these matters and that he based the cost upon the number of stonecutters who

First Department, May, 1921.  [Vol. 196

were working there and the quantity of the material that was taken up and relaid.

The next witness was one Charles N. Backus, who entered the employ of the plaintiff in October, 1902, and continued with them until November, 1904. He was an assistant to Mr. Clark, the superintendent. He had charge of the approval of vouchers and checked up the time books and payroll.

The next witness was James E. Potterton, who was employed by the plaintiff from August, 1903, until the Concourse work was completed. After its completion he was employed for a considerable time in the preparation of the accounts and other matters in connection with the Concourse litigation. When he first was employed he acted as timekeeper of the men on the job. In addition to this he testified that he attended to general office work, assisting Mr. Backus, and that from September, 1904, to 1906, Mr. Backus being absent on account of ill health, he only supervised the time keeping and performed about one-half of the duties which formerly devolved upon Mr. Backus. This witness, who was not an engineer and not connected with practical work of construction, was asked such questions as the following: " Did or did not the work on those sewers [referring to three sewer contracts] interfere with the Uvalde Company's contracts? " Objection was made to this question on the ground that if there was interference, such interference was covered by the contract provisions. " The Court: You may state what the interference was. (Objection overruled; exception by defendant.) A. They interfered to the extent that they occupied the site of our work. There is only one of the locations that you mention, One Hundred and Eighty-third street, that there may have been any serious interference to us because we were working right at the same location." This witness was shown plaintiff's exhibits 16 and 17, being letters written by Clark to the city's chief engineer, Briggs, and was asked, " Do you remember anything of the subject matter of these letters? " to which he replied, " Yes, I should say that there was a delay in obtaining the curb stakes." " Was it Mr. Clark's practice when he did not have curb stakes and monuments to write a letter at once or first make oral complaint and then after

awhile write a letter? " This was objected to as hearsay. The court overruled the objection and the witness answered, " I know that it was Mr. Clark's custom to go to the department and make oral requests for anything that he wanted before he ever followed it up with a letter." Of course this was only hearsay. The learned court erred in admitting such testimony. He was asked, " Do you remember whether or not there was any oral complaint made about the tracks in One Hundred and Sixty-first street? " and was permitted to answer, over objection, as follows: " I had some conversations with Mr. Clark in which he mentioned the fact that he had spoken on several occasions to the authorities about the tracks being in our way." Clearly, most incompetent testimony. This witness was allowed to testify as to the accounts and cost of the Concourse work as shown by the plaintiff's books. He prepared an account from the books showing the net cost to the plaintiff for performing the contract for the construction of the Concourse. These items were embodied in a statement which was put in evidence. This memorandum purports to show the actual cost of the various items of the work, such as earth excavation, rock excavation, fill, pipes, masonry, curbs, pavement, gutters, macadamizing, repairs and general expenses, superintendence and other matters. Having thus been allowed to testify to the cost of the work of constructing the Concourse, without any evidence tending to support the correctness of each of these items, two other witnesses were produced for the purpose of stating what in their opinion the work should have cost if a contractor were allowed to conduct the work according to his own views and methods. These witnesses were John B. Malatesta and Thomas J. Gillis.

They were first interrogated as to their general qualifications to testify, and were then asked whether they had examined the plans and specifications upon which the contract in suit was based. They were asked whether they had computed the fair and reasonable cost of doing the work required thereunder, and whether they had prepared memoranda of the various items involved therein. Objection was made to this line of testimony upon the ground, among other things, that such evidence was not proper to establish the damages of the claims sustained by the plaintiff. The objection

First Department, May, 1921. [Vol. 196

was overruled. Each of these witnesses was allowed to read his memorandum showing what the cost of the various items in his opinion would be, and then after these costs were totalized, the difference between their estimates of total cost and the total cost testified to by Mr. Potterton was accepted as measuring the damages sustained by the plaintiff by reason of the defendant's alleged wrongful acts.

The following questions put to and answers given by these witnesses will indicate the incompetency of their testimony upon which their estimates, were based, even if plaintiff's theory for ascertaining damages was correct. Malatesta was asked, "And you planned to prosecute the work in what manner? A. I looked over the plan of the work with an engineer from the Jerome Park Reservoir and we came to the *conclusion that there was only one way to do this work* [Italics ours], and that was to lay a track at the viaduct and take all the fill south and put it in there, providing we built our abutments and arch first. That was the first thing to do; the first thing to do is fill the arch. * * * Q. What else did you plan to do? A. To run the railroad from there south to One Hundred and Sixty-first street. Q. What about north of there? A. I planned to start there and fill up this hole south and keep on going north all the time, and the same way at Two Hundred and Fourth street. Q. And to use a railroad up there? A. Yes, on both sides, and that was the only way to do this work. Q. You did not calculate on doing all this by horses and trucks? A. I would want $2,000,000 if I calculated that way."

Gillis testified that he was called in to assist the plaintiff in preparing the case for trial and to give his opinion as to the reasonable and fair cost of doing the work called for by the contract. He was asked, "What was the fair and reasonable cost in the year 1902 to 1903 of excavating earth, excavating rock, filling and building retaining walls of various kinds and masonry such as went in the viaduct at One Hundred and Seventy-fifth street and macadamizing and laying sidewalks and curbs and gutters and work generally involved in this contract?" Objection was made to this question as being incompetent and irrelevant in proving damages. The objection was overruled and the witness was permitted to testify

as to the items which went into the work and what in his judgment should have gone into the work, and he also read from a statement on which he had made calculations of the number of cubic yards of earth and rock that would be required to be excavated, and the amount of fill, selected fill, and other measurements, and to give his opinion as to what the entire job should have cost the plaintiff.

Mr. Potterton was recalled after the testimony of these two witnesses had been given and was shown a paper dated November 6, 1919, entitled, " Memorandum of comparative cost of T. J. Gillis and actual cost of Concourse contract," as testified to by himself on which there were columns, headed as follows: " Gillis' Estimate Cost," " Actual Cost," " Profit," " Loss " and " Allowed Bill of Particulars." The witness explained that the item " Allowed bill of particulars " represented " the figures that we [meaning plaintiff] had in the bill of particulars." He was also shown a like paper prepared in the same way as the one which had just been described, excepting that it referred to the testimony of J. B. Malatesta. The witness testified that the column headed " Loss " showed what the actual loss of each item was to the plaintiff. Although objection was made to the introduction of such evidence on the ground that it was not a proper way of proving damages, the memoranda of both witnesses were admitted in evidence.

The two expert witnesses were practically allowed to decide the best way and manner in which the work was to be conducted, notwithstanding that the contract conferred that power upon the borough president and the chief engineer of the city. These witnesses set themselves up above the engineer and the borough president, and calmly ignored all the provisions in the contract which were intended to safeguard the interests of the defendant and fix the rights of the parties.

The rule of damages laid down by the learned trial justice was as follows: " In the assessment of damages here there is not any conflict with respect to amounts, that is, the City does not put upon the stand any person to dispute the figures that are presented by the plaintiff. The rule of damages is this: A person who is in the conduct of a work which it is alleged another person with whom he has con-

tracted has obstructed, hindered, delayed, interfered with or unreasonably delayed so as to cause him damage, is entitled to the difference in money between what it would have cost him to do the work if he were allowed to proceed reasonably or allowed to proceed unmolested by any arbitrary action or unreasonable action of his co-contractor and what it did cost him to do the work in the event of his being actually obstructed, hindered, delayed, interfered with, or where there was failure upon the part of his contractor to supply him with the necessary facilities which the contract accorded him. That is the rule of damages and it is a simple rule and it is a very reasonable rule. I am entitled to do the work at such a price as will not cause me any more loss for output of money to do the work than I ought to be compelled to put out by the reasonable conduct of my contractor, whether it be a City or private contractor. That difference you have here in specific items. There is no dispute with respect to that and that does not mean necessarily that you are bound by those figures. All figures are of course estimates excepting those which have been actually paid out. The cost of doing this work is not disputed. The actual cost of men, teams, rock, granite and fill and what-not that was brought into this work is a matter of mathematical demonstration and there is no dispute about what that is. The amount that it ought to have cost in the ordinary course of events without unreasonable interference, without any delay that is not usual and common in work of this kind, without any lack of assistance, reasonably to be anticipated in affording facilities to do it on the part of the City is here in the testimony of experts and there is no dispute by any such expert so that you have not that particular thing to reconcile and you are the judges of their opinion. That is, you are to determine reasonably whether or not what they say in regard to the amount of the work does seem to be a reasonable charge or sum for the particular items as you have heard them described."

We are thus clearly confronted with the question whether the objections of the defendant to the rule of damages taken upon the trial, and which the learned trial justice in his charge instructed the jury to follow, were well taken.

As previously stated, the method allowed for ascertaining

the amount of damages sustained by plaintiff overlooks and ignores the many special provisions of the contract, which vested the power in the borough president and also in the chief engineer to determine the manner in which and the conditions under which the work was to be performed. Some of these provisions will be briefly restated. Plaintiff was not permitted to assert a claim that there was " any misunderstanding in regard to the depth or character of the excavation to be made or the nature or amount of the materials to be furnished or work to be done." The right was reserved to the president of the borough "to determine the times and places for commencing and prosecuting the work." Postponement or delay on the whole or any part thereof, occasioned by the precedence of other contracts, which might be either let or executed before or after the execution of the contract, was not to constitute a claim for damages nor for a reduction of the damages fixed for delay in completing the work beyond the time allowed. The chief engineer was made the arbiter of all disputes " in relation to the work and the construction thereof," and " he shall in all cases decide every question which may arise relative to the execution of this contract on the part of the contractor and his estimate and decision shall be final and conclusive, and   *   *   *   shall be a condition precedent to the right of the contractor to receive any money under this agreement." It was also provided that " the contractor will carry on the work with such force and in such manner and order, and at such times and seasons as may be directed by the engineer." The plaintiff was " required to afford the necessary facilities to the company or companies owning rail tracks on the line of the work, or to their agents, in the preservation of the same from injury, either by removal or otherwise, without charge therefor." The right was reserved in the president to determine when operations upon the work were to be suspended from time to time, and that during such suspensions " all materials delivered upon but not placed in the work shall be neatly piled or removed, so as not to obstruct public travel."

It was also provided that " any incumbrances or obstacles which may be upon the line of the work when it is begun, or may thereafter be placed there, shall, if directed by the engineer, be removed by the contractor at his own expense." The

contractor also agreed to sustain " all loss or damage arising out of the nature of the work to be done   *   *   *,   or from any unforeseen or unusual obstructions or difficulties which may be encountered in the prosecution of the same, or from the action of the elements."

Respondent relies upon *Borough Construction Co.* v. *City of New York* (200 N. Y. 149). The court at page 155 referred to the rule of damages stated in *Lentilhon* v. *City of New York* (102 App. Div. 548; affd., 185 N. Y. 549) as follows: " Damages as for a breach of contract may be recovered for an erroneous direction of a representative of a municipality, authorized to give directions in the premises in superintending the execution of contract work, which are insisted upon and necessitate the performance of more work than the contract, properly interpreted, requires, and the contractor has an election either to refuse to proceed and recover upon a *quantum meruit* for the work already done or to continue under protest and recover the value of the extra work upon a *quantum meruit* as the measure of damages for the breach of contract." The court also referred to *People ex rel. Powers & M. Co.* v. *Schneider* (191 N. Y. 523), in which the contractor complied with the improper instructions of the engineer and was allowed " to recover what amounted to the extra cost of doing work which he had been improperly instructed to do."

In other words, the authorities just referred to recognize that the proper rule of damages, in a case where the contractor has complied with the improper demands of the owner under protest and completed his contract, which is the case before us, is that damages are to be based upon a *quantum meruit* of the increased cost incurred in consequence of unwarranted interferences. Indeed, in *Borough Construction Co.* v. *City of New York* (*supra*), which was the case of an executed contract, the opinion concludes as follows: " I, therefore, reach the conclusion that a judgment awarding damages measured by some of the items proved might be sustained, but that the jury were permitted to take into account other items which were not a proper subject for consideration, and inasmuch as it is not possible to determine from the verdict which ones were made the measure of damages, it seems necessary to reverse the judgment and grant a new trial."

The rule of damages is well illustrated in *Nason Manufacturing Company* v. *Stephens* (127 N. Y. 602), which also was a case where the contract was an executed one. The court there said at page 606: " The plaintiff's claim was governed by the contract so far as the work performed could be traced by it, and beyond that the plaintiff was entitled to the *quantum meruit.* [Citing cases.] The contract, as first made, determined the price of the entire work. But by reason of the deviation from the method originally contemplated by the parties to render the work of construction of the extension of the tower accessible to the workmen, the contract did not furnish any guide to the cost of that rendered necessary for such purpose, and the plaintiff necessarily had to resort to evidence in that respect if it sought, as it was entitled, to recover for any additional expense occasioned by such deviation. This increased expense was for the plaintiff to show by proving that the means it was required to adopt for the purpose were more, and how much more, expensive than would have been those which it was contemplated when the contract was made could be provided for the men to work from upon the tower."

In *Thilemann* v. *City of New York* (82 App. Div. 136), where a contractor was interfered with by the city in the building of a sewer in allowing dumping on the premises, the court said: " By its own act in permitting the other contractors to proceed with grading  *  *  *  the city increased the plaintiff's work, and for the additional cost it should respond in damages." The rule adopted upon the trial of the instant case was one that might be proper in a case where there was a breach of an executory contract. In such a case, the contractor, not having been permitted to perform, would necessarily be in a position where he could not show what the actual cost would be of doing the work as provided for by the contract, and he may, therefore, produce evidence as to the estimated cost of doing the work had he been permitted to perform, and the difference between that and the contract price would fairly measure his damages.

*Long Island C. & S. Co.* v. *City of New York* (204 N. Y. 73), which plaintiff cites, was a case brought for damages for the breach of an executory contract in which the court said: " We think that, according to the record now before us, the plaintiff

should have recovered as damages for the absolute breach of the contract by the defendant the difference between the cost of performing the contract and the amount agreed upon as compensation, including as part thereof the market value of the top soil, after deducting the reasonable expense of marketing the same." But the rule is different in the case of an executed contract in which it is claimed that interferences and other acts of the party sought to be charged increased the cost of the work. In such a case it is incumbent upon the one who claims to have been damaged to show how much the cost of doing the work was increased by the improper acts of the other party. He should be limited to the precise damages that he actually sustained by reason of the interferences.

The rule is clearly stated in *Keenan & Son, Inc.,* v. *Johns-Manville Co.* (184 App. Div. 98), which was a case in which damages were sought because of non-compliance on the part of the defendant with certain provisions of the contract, as a result of which plaintiff was put to additional cost in completing the work. The court said at page 101: " The question involved on this appeal is as to the manner of proving damages, assuming defendant failed to keep its agreement to furnish the necessary cars upon which to load the machinery. It seems to me that the measure of damages adopted was erroneous. The plaintiff had a very simple and logical way of establishing its damages upon proof of a breach of the contract. If the defendant neglected to furnish the necessary cars to enable plaintiff to expeditiously perform its contract, plaintiff could have proven direct damages which it sustained by reason of being delayed. It might have shown the expense it was put to by reason of maintaining, during the period of delay, its force of men and trucks. It might have shown additional expense caused by being forced to unload its trucks at the Bush Terminal yards and rehandle the goods when they were finally loaded upon cars when furnished. An element of its damage might have arisen from extra insurance which it was compelled to carry during the period of delay, and, perhaps, interest upon capital invested. These elements of damage would have been entirely proper, and would have flowed logically from the breach of the contract by defendant, if there was any such breach."

It is thus well settled that where the damages are of such a nature as to be capable of definite ascertainment, the party asserting them must resort to such proof. In the instant case it was incumbent upon the plaintiff, in every instance where it claimed that the city had unjustly interfered with its work or omitted to do something which it was obligated to do, to show, first, that there was such unlawful interference or improper action taken or omitted by the city, and then to establish by competent evidence what loss it sustained by reason of the given act of interference or wrongdoing. The jury would thus be obliged to consider every instance of interference and the increased expense necessarily incurred thereby as a special item of damage. It is to be remembered that this work covered an area of about four miles and that the plaintiff was working thereon at different parts of the job. The evidence of the plaintiff was very unsatisfactory in its details as to the direct effect of defendant's alleged unlawful interferences in increasing the cost of construction entitling it to damages. This may have been due to some extent perhaps to the death of Mr. Clark, whose testimony was unavailable, and doubtless also to the fact that it was very difficult, in view of the character of the work, bearing in mind that the contract was not for a definite sum but upon a unit price basis and that it covered a very large area, and in view of the numerous provisions in the contract which debarred plaintiff from recovering damages by reason of the power conferred upon the city to control and direct the way in which the work should be done, and to suspend operations when in the judgment of the borough president that was desirable, and of the power vested in the chief engineer as arbiter to " determine all questions in relation to the work and the construction thereof, or the materials employed therein, and * * * in all cases decide every question which may arise relative to the execution of this contract on the part of the contractor." The burden, however, was upon the plaintiff to prove with reasonable certainty and detail the damages, if any, sustained by it under the contract.

For the errors committed during the course of the trial in admitting incompetent testimony and for the erroneous measure of damages upon which the case was submitted to the jury, the judgment and order must be reversed and the action

severed, and judgment directed to be entered upon the verdict directed for the plaintiff upon the first cause of action, with trial costs to be taxed but without costs of this appeal, and a new trial ordered as to the second cause of action, with costs of this appeal to the appellant to abide the event.

CLARKE, P. J., DOWLING, SMITH and PAGE, JJ., concur.

Judgment and order reversed and the action severed, and judgment directed to be entered on the verdict directed for the plaintiff upon the first cause of action, with trial costs to be taxed but without costs of this appeal, and new trial ordered as to the second cause of action, with costs of this appeal to the appellant to abide the event.    Settle order on notice.