DEGNON CONTRACTING COMPANY, Respondent, *v.* THE CITY OF NEW YORK, Appellant.

First Department, July 14, 1922.

**Municipal corporations — city of New York — action to recover damages caused by alleged negligent delay by engineer of Public Service Commission in furnishing plans for construction of subway — city not liable for negligence of said engineer — if city were liable for negligence notice was not given as required by contract — no damage shown as plaintiff had not settled voluntarily or otherwise with subcontractor who did work — measure of damages is not difference in contract price and cost of doing work in most approved manner testified to by experts — no liability for extra cost of " by-passing " gas mains where by-pass not directed by engineer — evidence — testimony that " by-passing " was necessary was incompetent as engineer was sole judge of necessity — letters of subordinates of engineer not competent.**

The city of New York cannot be held liable for damages resulting to the plaintiff, a subway contractor, caused by the negligence of the engineer of the Public Service Commission in failing to supply the plaintiff with necessary plans as provided for under the contract.

Furthermore, it appears that the parties by express agreement have recognized that the engineer occupies a position over which the defendant has no control, and that both the defendant and the plaintiff would in many instances be absolutely bound by the decision which the engineer might make, assuming, of course, that it was not made as the result of fraud or bad faith.

Moreover, if it be assumed that the city might, under certain circumstances, be liable, the plaintiff did not serve the notice required by the contract to fix that liability, and failure to do so would be fatal to a recovery.

Assuming a liability by the city for damages, the plaintiff is not entitled to recover, since it appears that the work was done by a subcontractor and the plaintiff did not show that it had either voluntarily or otherwise adjusted any claim flowing from the delay by the subcontractor asserted against it.

The measure of damages which was based on the difference in the contract price and the cost of doing the work in the most approved manner, testified to by experts, was wrong.

The contract provided that the plaintiff should be entitled to extra compensation for " by-passing " gas mains " if directed by the engineer," and, therefore, it cannot recover for by passes which were constructed without direction on the part of the engineer.

It was error to admit testimony that the by-passes in question were necessary, for the engineer was the sole judge of the necessity of making a by-pass and testimony as to whether or not the judgment exercised by the engineer was correct was incompetent.

Letters of subordinates of the engineer were incompetent in the absence of any showing that they were sent with the engineer's approval.

Merrell, J., dissents, with opinion.

Appeal by the defendant, The City of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 10th day of April, 1920, upon the verdict of a jury; also from an order entered in said clerk's office on the 21st day of March, 1920, directing the clerk to add interest to the verdict from October 1, 1916, to the date thereof, and also from an order entered in said clerk's office on the 8th day of April, 1920, granting plaintiff an extra allowance of $1,000.

*John P. O'Brien*, Corporation Counsel [*Elliot S. Benedict* of counsel; *John F. O'Brien, James A. Donnelly* and *Harold Taylor* with him on the brief], for the appellant.

*Parker & Aaron* [*Herman Aaron* of counsel; *Charles A. Baker* with him on the brief], for the respondent.

Greenbaum, J.:

The third, sixth and seventh causes of action alleged in the complaint are the only ones involved on this appeal. The " seventh " is for damages alleged to have been sustained from the defendant's breach of the contract occasioned by the delay on the part of the engineer of the Public Service Commission in furnishing the plaintiff with certain steel drawings as required by the contract for long

and unreasonable periods of time and in furnishing the drawings at irregular intervals and in a non-consecutive order, thereby increasing the cost of performance of the contract.

The " third " and " sixth " causes of action are for the construction of what is called " By-passing." By that term is meant the temporary cutting out or non-user of the gas mains under the street and the laying of substituted temporary overhead gas pipes until all danger attendant upon the use of the original pipes is passed.

The plaintiff, respondent, claims that it is entitled to be recompensed for the expense involved in constructing the " by-passing." The jury found in favor of the plaintiff on both claims, *i. e.*, the sum of $153,553 for the item of delay and $31,263 for " by-passing," to which the court afterwards directed the clerk to add interest.

The first question that confronts us is whether the defendant is liable for the delays in furnishing the steel drawings to the plaintiff on the part of the engineer of the Public Service Commission. There were three general sets of plans or drawings provided for by the contract. The first set of plans are known as contract drawings, which are delivered to bidders for the contract at the charge of five dollars for a set. The second set of plans are known as construction or amplifying drawings showing the location, elevation of the structure and its appurtenances and the various details connected therewith and are required to be furnished from time to time by the engineer of the Public Service Commission. The third set of plans are made from the amplifying drawings and are known as shop drawings giving minute details of the steel construction. These last-named drawings are made in the first instance by the contractor and are submitted to the engineer of the Public Service Commission for his approval.

The theory of the plaintiff's claim is that if it had been furnished with the amplifying plans at the time operations were started in January, 1913, the performance of the contract would have been completed by September, 1914.

The rule ordinarily applicable to the construction of contracts between private individuals and private corporations is that where the language of the agreement manifests a clear intention that the parties shall do certain acts, an action for damages for non-performance thereof will lie. It is upon this proposition that the plaintiff rests its claim, relying upon the case of *Mansfield* v. *N. Y. C. & H. R. R. R. Co.* (102 N. Y. 205) and which Mr. Justice MERRELL cites in his dissenting opinion. But it must be manifest that where a contract between the parties does not clearly indicate that one of them will be responsible for certain acts complained of, the rule is not applicable.

The Public Service Commission of the First District, at the time in question, was charged by law with the preparation of plans for the construction of subways, and the contract in terms states that it was made under the authority of the Rapid Transit Act. (See Laws of 1891, chap. 4, § 6, as amd. by Laws of 1909, chap. 498, and Laws of 1910, chap. 205; Id. § 26, as amd. by Laws of 1909, chap. 498; Laws of 1910, chap. 205, and Laws of 1912, chap. 226, renumbering § 34, added by Laws of 1894, chap. 752, as amd.)

It has been repeatedly held that the Rapid Transit Railroad Commissioners, as they were formerly termed, or the Public Service Commissioners of the First District, as their successors at the time in question were called, and who have been since superseded by the Transit Commissioners, are not agents in a general sense of the city of New York, nor are any of their employees to be regarded as such agents. The Public Service Commission is a State body, independent of the municipal government. (*People ex rel. New York Dock Co.* v. *Delaney,* 192 App. Div. 734, 739.)

In actions for injuries brought on the theory of negligence it has frequently been held that the negligence of the Commissioners or their agents is not imputable to the city. (*O'Brien* v. *City of New York,* 182 App. Div. 810, 813.) The Massachusetts Supreme Court has also so held. (*Mahoney* v. *Boston,* 171 Mass. 427; *Murphy* v. *Hugh Nawn Contracting Co.,* 223 id. 404; *McGovern* v. *Boston,* 229 id. 394.)

In the last-mentioned case (*McGovern* v. *Boston, supra*) the plaintiffs had made a contract with the city of Boston through the Boston Transit Commission, a body created by law,[*] similar in its essential aspects to our Public Service Commission of the First District. The action was brought to recover from the city of Boston the sum of $240,000, the alleged additional sum required in the performance of the contract by reason of certain acts of commission or omission on the part of the Boston Transit Commission and its engineer in concealing from them the true character of the material which would be necessary for them to remove and of which the commission was apprised as a result of borings which had been made. The court held that in making the contract in question " the members of the Boston Transit Commission * * * were not servants or agents of the city, but acted as public officers. As such the city is not liable for their negligence." The court further stated (pp. 397, 398): "As the city cannot be chargeable upon an express contract entered into in contravention of the statute,[†] it is equally

---

[*] See Mass Acts of 1894, chap. 548, § 23 *et seq.*— [REP.
[†] See Mass. Acts of 1911, chap. 741, § 17.— [REP.

plain that no recovery can be had upon an implied contract: to permit such recovery would be to defeat one of the purposes for which the statute was enacted. To allow the plaintiffs to recover upon a *quantum meruit* would be contrary to the spirit as well as to the letter of the statute, and would be in plain disregard of its terms. (*Bartlett* v. *Lowell*, 201 Mass. 151.) The statute evidently was enacted to safeguard the interests of the defendant; it cannot be evaded or annulled, and must be held to be in full force and effect."

In the instant case the theory of the complaint is that the acts of the Commission or its chief engineer were careless, in that they delayed in giving certain plans to the plaintiffs. In other words, the real basis of the claim is the negligence of the engineer or his subordinates.

The contract in suit specifically provided as to detail drawings as follows: " Section No. 36. The Engineer [referring to the engineer of the Public Service Commission] will prepare and furnish to the contractor, from time to time as required, drawings and plans amplifying such details of the contract drawings as may be necessary; and drawings and plans necessary to show the adjustment and reconstruction of all surface and sub-surface structures wherever the reconstruction of the same is necessitated by the construction of the railroad. These plans must be strictly followed, unless local conditions should develop, during the construction, suggesting changes, when, with the approval of the engineer, such changes may be permitted."

Under article 24 it is provided that the engineer " shall determine all questions in relation to the works and the construction thereof and shall in all cases determine every question which may arise relative to fulfillment of this contract on the part of the contractor. His determination and estimate shall be final and conclusive upon the contractor, and in case any question shall arise between the parties hereto, touching this contract, such determination and estimate shall be a condition precedent to the right of the contractor to receive any money under this contract."

It thus appears that the parties by express agreement have recognized that the engineer occupies a position over which the defendant has no control and that both the defendant and the plaintiff would in many instances be absolutely bound by the decision which the engineer may make, assuming, of course, that it is not made as the result of fraud or of bad faith. It is difficult to understand upon what theory the city may be held liable for the acts of the engineer in delaying the delivery of plans to plaintiff who knew or was presumed to know the provision of the statute and the con-

tract, which conferred the power upon the engineer to prepare plans and furnish them to the contractor.

It would seem to follow that it must have been understood by the parties that for any negligence or delay occasioned by the engineer in respect of a matter under his jurisdiction and over which the city had no control whatever, the city could not be held responsible. Moreover, the contract contains a provision which requires the construction work to be performed thereunder to be completed within a certain time and also provisions to the effect that if the contractor is delayed by causes over which he has no control he would be entitled to additional time for completing the work, to the extent to which he has thus been delayed.

Even if we assume that the city might under certain circumstances be liable, it should at least then be made to appear that the defendant was duly notified of the delay to which the plaintiff was put, to afford an opportunity to the city to remedy the troubles complained of, if it was within its ability or power so to do.

Article 43 of the contract reads as follows:

" Contractor's claims for damage. Statement of damage to be filed with the engineer. Article XLIII. If the contractor shall claim compensation for any damage sustained by reason of the acts of the Commission, or its agents, he shall, within ten days after sustaining such damage, make a written statement of the nature of the damage sustained to the engineer. On or before the 15th day of the month succeeding that in which any such damage shall have been sustained, the contractor shall file with the engineer an itemized statement of the details and amount of such damage, and, unless such statement shall be made as thus required, his claim for compensation may be forfeited and invalidated, and he shall not be entitled to payment on account of any such damage."

It seems to me that this was a precautionary provision which was designed to prevent such a claim as the one here asserted. Assuming, however, that a liability against the city under this clause could be predicated under the acts of the engineer of the Commission, then we must treat this clause as meaning that there would be a strict compliance thereof by filing the statement as therein required, and a failure so to do is fatal to a recovery. But assuming that the city is liable for damages, it is clear that it is incumbent upon the plaintiff to establish damages which directly resulted from the acts complained of. In this case it appears that the plaintiff had subcontracted the work. There was no evidence to show that the plaintiff had either voluntarily adjusted any claim flowing from the delay by the subcontractor asserted against it, or that any judgment for damages resulting from the delay com-

plained of in this case was recovered by the subcontractor against the defendant.

The rule has been stated in *Dunn* v. *Uvalde Asphalt Paving Co.* (175 N. Y. 214, 218) as follows: " The contract of indemnity implied by law, in favor of one who is legally liable for the negligence of another, covers loss or damage, and not mere liability. (Sedgwick on Damages,* sec. 785; *Oceanic S. N. Co.* v. *Compania T. E.*, 134 N. Y. 461; *Village of Port Jervis* v. *First Nat. Bank*, 96 N. Y. 550.) On the other hand, such loss or damage may be voluntarily paid by the innocent party who is legally liable without waiting for judgment. (Thompson on Negligence, p. 789; *Gray* v. *Boston Gas Light Co.*, 114 Mass. 149, cited with approval in *Oceanic S. N. Co.* v. *Compania T. E.*, 134 N. Y. 461), but, in that event, he undoubtedly assumes the risk of being able to prove the actionable facts upon which his liability depends as well as the reasonableness of the amount which he pays."

I think the measure of damages is also criticizable for other reasons. The court permitted expert testimony to be given to show how long it would take to complete the work under ideal conditions. While it may be true that the engineer of the Public Service Commission had a right to give defendant certain latitude in the manner of continuing and progressing the work, nevertheless, the engineer of the Public Service Commission was really the only one who could determine how the work should be performed, so that what may be regarded by others as an ideal condition cannot control the rights of the parties.

The theory of damages allowed by the court was based upon the difference between the contract price and the cost of doing the work in the most approved manner as evidenced by the testimony of alleged experts as to what in their opinion would be the most economical and most expeditious way of doing the work.

The contract did not provide when the drawings were to be furnished by the engineer. The engineer had the absolute power to determine in what manner the work was to be done. In the absence of proof that the actions of the engineer were corrupt or malicious, they should not be subject to review by the court. If outside testimony should be permitted to be given that the work could be prosecuted more expeditiously than by the method adopted by the Commission's engineer, the value of a public contract would be nil.

The rule of damages applicable to a case like this was discussed in the case of *Uvalde Asphalt Paving Co.* v. *City of New York* (196

---

* See 8th ed.— [Rep.

App. Div. 740). It was there pointed out that the rule of damages applicable to a breach of an executory contract is different from that arising upon an executed contract. We there stated with reference to the rule of damages under an executed contract (p. 762) that " in such a case it is incumbent upon the one who claims to have been damaged to show how much the cost of doing the work was increased by the improper acts of the other party. He should be limited to the precise damages that he actually sustained by reason of the interferences." In other words, in such a case the party claiming damages is or could be in a position to testify with reasonable certainty as to the actual cost to which he was subjected by the breach of the other party. In the case at bar the proofs are that the plaintiff kept no records showing the additional expense to which it claims it was put from time to time by the acts of the defendant. The theory of damages which the plaintiff urged and which was sustained by the court was that it had the right to determine the plan or method of operation of the work contracted for and to proceed therewith according to the method which it had deemed most economical and desirable. The contract, however, confers upon the engineer the power of determining the way, method and sequence in which the work is to be carried on. Plaintiff was permitted to submit opinion evidence or estimates of what the additional cost was to the plaintiff by reason of the alleged delay in furnishing plans. A few illustrations will suffice to indicate the impropriety of permitting plaintiff's expert witnesses to give such opinion evidence. For example, one of the claims made was that the plaintiff was subjected to extra cost of labor due to shifting various kinds of machinery used in the construction of the subway. Testimony was given in behalf of the plaintiff that it involved the expense of the whole outfit that was employed at the derrick for the length of time " that it took to do it." " Q. Do you know how long it took to do it? A. I testified to that yesterday, I think; I don't remember what I said. I think I said it might have taken two weeks and might not have taken more than a week. Q. Do you know what the expense was? A. No, sir. Q. You haven't made any preparation on that? A. No, sir."

Here was an item which could definitely have been proven if any records thereof were kept. The same witness testified that he could not give any record or any date as to the exact amount of expense involved in making the various shifts in plant, the reason for that being that no records were kept.

Another item of damage was for $24,667, the extra cost of timber due to the acts of the engineer of the Commission. The witness was asked how he arrived at the extra cost of the timber

and answered as follows: " Why, assuming that had the work been carried on continuously instead of interruptedly, 3,500 linear feet of timber trench in the first cut and 1,500 linear feet of trench in the second cut would have provided substantially enough timber to have timbered the whole cut between 87th Street and 66th Street. Figuring the amount or cost of that timber at the prices which we paid and deducting that amount from the amount that we actually did pay, I arrived at the difference. Q. Of $24,667? A. Substantially that. Q. Well is it more than that or less than that? That is the amount stated in the itemized bill that was filed with the Comptroller. What are your figures? A. My figures that I testified to on direct testimony are more, but the same thing applies to that thing as applied to the explanation that I made of that difference in regard to the excavation. In other words it was a matter of judgment at the time that I made up the bill, arrived at substantially as I told you, through an effort to keep it as near right as I could from my judgment, with the expectation that when I had an opportunity to analyze it more thoroughly that the figure that I had given to the Comptroller and the one that is represented on the bill would at least not be higher than what a more careful analysis would show." It seems to me that error was also committed with respect to the damages allowed for " by-passing " gas mains. The specifications which formed a part of the contract between the parties provided as follows:

" By-passing gas mains. Section No. 52. Wherever the excavations are decked, all gas pipes whose services cannot temporarily be dispensed with shall be by-passed, *if directed by the engineer;* temporary pipes to take their place being laid either upon or below the street or sidewalk surfaces. These temporary by-passing pipes will be paid for at the prices stipulated in Schedule Item 99-A." (Italics mine.)

Section 59 of the specifications reads as follows:

" Maintenance, support, etc. Section No. 59. The contractor shall at all times, by suitable bridging or other supports, maintain and support in an entirely safe condition for the usual service and to the reasonable satisfaction of the owners, all surface, sub-surface and overhead structures and appurtenances encountered or affected during the prosecution of his work. Also, in order that access may be had in emergencies to gates or valves on water or gas mains and to electric manholes, where such gates or valves and manholes are decked over, trap doors of a suitable size shall be provided in the decking. All surface, sub-surface and overhead structures and appurtenances, and all surfaces of whatever character along

the line of the work shall be protected from injury, but should any injury occur the contractor shall fully restore such surface, sub-surface or overhead structures and appurtenances or surfaces to as good a condition as existed before the injury was done. All the above, including also all changes of surface, sub-surface or overhead structures and appurtenances made by the contractor for his own convenience in executing his work, shall be done at the contractor's own expense and included in the prices stipulated in the schedule for excavation except as otherwise herein specifically provided."

The following articles of the contract or parts thereof are also apposite:

" Engineer's determination to be final and conclusive upon contractor. Article XXIV. To prevent disputes and litigations, the engineer shall in all cases determine the amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract; shall determine all questions in relation to the works and the construction thereof, and shall in all cases determine every question which may arise relative to the fulfillment of this contract on the part of the contractor. His determination and estimate shall be final and conclusive upon the contractor, and in case any question shall arise between the parties hereto, touching this contract, such determination and estimate shall be a condition precedent to the right of the contractor to receive any money under this contract.

" Engineer to explain. Article XXV. The engineer shall make all necessary explanations as to the meaning and intention of the specifications, shall give all orders and directions contemplated therein or thereby and in every case in which a difficult or unforeseen condition shall arise in the performance of the work required by this contract."

A reading of these paragraphs, I think, warrants the conclusion that the engineer has the sole power for deciding as to whether there should be " by-passing " or not, and that where the engineer decides that there was to be no " by-passing " of gas mains, the contractor would nevertheless have the right if he thought the situation warranted it to do such " by-passing," but in such a case the expense for that work is not chargeable upon the city.

Unless it can be shown that the " by-passing " was done upon the direction of the chief engineer there can be no recovery upon that item. Testimony given under the objection of the defendant's counsel for the purpose of showing that the work of " by-passing " was necessary was, to my mind, entirely incompetent. Such testimony tended to present the question as to whether or not the

judgment exercised by the chief engineer was correct. Under the terms of the contract the engineer was the sole judge in determining whether the " by-passing " should be done by the contractor, and unless it can be shown that the engineer acted corruptly or arbitrarily his decision on that matter was final.

The letters of subordinates of the chief engineer that were admitted in evidence should have been excluded unless it could have been shown that they were sent with the approval of the chief engineer and that it was thereby intended to direct the " by-passing " to be done by the contractor for which it would be entitled to reimbursement on the part of the city.

The judgment and orders should be reversed and a new trial granted, with costs to appellant to abide the event.

CLARKE, P. J., and SMITH, J., concur; LAUGHLIN, J., concurs in result; MERRELL, J., dissents.

MERRELL, J. (dissenting):

The plaintiff, Degnon Contracting Company, is a foreign corporation, duly organized under and by virtue of the laws of the State of New Jersey, duly authorized to transact business in the State of New York. On or about October 2, 1912, the plaintiff entered into a contract with the defendant, The City of New York, acting through and by the Public Service Commission of the First District, pursuant to the Rapid Transit Act (so called), to construct sections Nos. 1 and 2, route No. 11-B, Fourth Avenue subway, in the borough of Brooklyn.

It is admitted by the defendant, and was expressly alleged in its answer, that the plaintiff duly entered into said " contract, in writing, *with the City of New York*, defendant, acting by the Public Service Commission." It is well, at the outset, to bear in mind that it is the contract of the city of New York with which we have to deal.

Section No. 1 of the subway, the construction of which was embraced in the contract, extended from a point 25 feet south of Fortieth street to a point 110 feet south of Sixty-first street in the borough of Brooklyn; and section No. 2 extended from the last-mentioned point to a point 310 feet south of the center line of Eighty-ninth street in said borough of Brooklyn. Subsequently, section No. 2 was changed so that the southern terminus thereof was located at the south end of the Eighty-sixth street station. Separate contracts were entered into between the plaintiff and said Public Service Commission as to said two contiguous sections. For the purposes of its convenience in carrying on said construction work, the plaintiff subdivided its entire contract into two parts

or sections, making the division line at the Long Island railroad crossing at Sixty-sixth street, calling everything north of Sixty-sixth street the north section, and everything south to the south end of the Eighty-sixth street station the south section. The two contracts with the city were substantially alike, and in each it was provided that

" Time is of the essence of this contract. The contractor shall begin actual work within sixty (60) days after the delivery of this contract. The entire work covered by this contract shall be completed in all respects within twenty-four (24) months from the date of the delivery of this contract."

Each contract contained provisions reducing the price which the contractor was to receive for the work in case of its delay in completion beyond the twenty-four months, and according the city drastic powers in the event of such delay. It was further provided by article 16 of the contract that

" The contractor shall complete the entire work in accordance with the specifications and contract drawings, and according to the other provisions of this contract and within the times specified in this contract, in the most workmanlike manner and with the highest regard to the safety of life and property and according to the lines, levels and directions given by the engineer, for the prices herein agreed upon."

This action was brought to recover of the defendant, The City of New York, damages claimed to have been sustained by the plaintiff in seven different respects, and in its complaint the plaintiff sets forth and alleges seven separate and distinct causes of action. Those numbered first, second, fourth and fifth were eliminated by stipulation before or at the trial, and a part of the third and sixth causes of action, relating to the reconstruction of electric ducts and grading of sidewalks in both sections, were dismissed by the court upon the trial, and the plaintiff has not appealed therefrom. The issues raised by the pleadings as to so much of the third cause of action and the sixth cause of action set forth in plaintiff's complaint as related to the by-passing of gas mains in said sections 1 and 2, and plaintiff's right to recover therefor, were submitted to the jury, and the jury returned a verdict in plaintiff's favor for the sum of $31,263, to which, by order of the court, there was added interest in the sum of $6,502.70. Plaintiff's seventh cause of action was to recover damages alleged to have been caused by the delay of the defendant in furnishing certain construction drawings or " steel drawings," as they were called, which the defendant was obliged to furnish under the

26

terms of the contract for the guidance of the plaintiff in procuring the fabrication of the necessary steel in connection with said construction, it being also claimed that such drawings were furnished in an irregular and disconnected order, instead of in consecutive sections, as required by the plaintiff in carrying on such construction. The issues with reference to plaintiff's said alleged seventh cause of action were also submitted to the jury, and the jury returned a verdict in plaintiff's favor and against the defendant thereon in the sum of $153,553. Upon all of these items for by-passing, and interest, and for delay and irregularity in the order in which the steel drawings were furnished, judgment was entered in favor of the plaintiff and against the defendant for $191,318.70 damages, and interest thereon, amounting to $733.38, to the date of the verdict, together with the sum of $142.95 costs and disbursements, and an extra allowance of $1,000 costs, making an aggregate judgment in plaintiff's favor and against the defendant of $193,195.03. From such judgment the defendant has appealed.

Upon this appeal the defendant urges several grounds upon which it seeks a reversal of the judgment so entered against it. As to the plaintiff's recovery for delay in furnishing the required plans and specifications for the steel drawings, the defendant contends that such delay or other negligence was that of subordinates of the Public Service Commission charged with furnishing construction or amplifying drawings to the contractor, for which negligence and delay the city is not responsible.

It is also claimed by the appellant that, inasmuch as the actual construction work was sublet by the plaintiff to a subcontractor upon a percentage basis, whatever damages were suffered by reason of delay or otherwise could be claimed only by the subcontractor, and that the plaintiff has not actually suffered as the result of such delay.

It is also the contention of the appellant that the contract provided a remedy to the contractor in case the work was delayed by way of an extension of time to complete it, and that, therefore, damages may not be recovered for such delay.

The appellant also contends that, by requesting and accepting extensions of time to complete the work, the contractor waived any claim for delay attributable to the defendant.

With reference to the plaintiff's claim, the appellant urges that under the provisions of the contract the contractor was derelict in presenting its claim for damages.

The appellant also contends that the court improperly submitted plaintiff's claim for damages by reason of alleged delays by the defendant in furnishing the necessary drawings, and also in fur-

nishing the same for non-contiguous sections, on the theory that such damages should be measured by the difference between what the work actually cost and what it might have cost under ideal and unproved conditions.

The appellant also contends that the verdict of the jury upon the delay claim was against the weight of the evidence.

Error is also claimed by the appellant in the manner in which the issues on the claims for by-passing were submitted to the jury, and also that the court erroneously allowed interest upon the amount of the by-passing claim for which the plaintiff recovered a verdict.

The extra allowance of costs to the plaintiff is also assailed by the appellant.

Taking up these various contentions of the appellant, it seems to me, first, that the plaintiff established a sufficient basis for its claim against the city for damages arising from the delay of the engineer of the Public Service Commission in furnishing the required construction and steel drawings. Plaintiff's claim for such delay arises with reference to section 2 of the work. The plaintiff makes no claim for damages for delay in furnishing plans and drawings with relation to section 1. The plaintiff claims that the city failed to keep its contract with the plaintiff to furnish the plaintiff with steel drawings in accordance with the terms of the contract, and in continuing such breach of contract for such an unreasonable period as to result in great damage to the plaintiff in carrying on its construction work. Furthermore, the plaintiff contends that, when the defendant did furnish the required construction drawings necessarily used in procuring the fabrication of the steel work, the same were supplied at straggling and irregular intervals and in scattered, disconnected portions of the section. The plaintiff claims that such delay and such disconnected manner in which the plans were furnished resulted in greatly increased expense in the construction of the subway, and interfered with plaintiff's orderly plans for excavating and building the subway structure. The plaintiff planned, with the approval of the Public Service Commission, to start its work on section 2 at the southerly or Eighty-sixth street end, and to work north to the northerly terminus of said section at Sixty-sixth street. It is the claim of the plaintiff that the subway could be built in this manner at a minimum cost, and it does not require an expert to appreciate the force of such claim. The construction involved several different steps. First, the excavation had to be made, which was accomplished by means of a steam shovel, which excavated part of the required depth of the trench; the second step of the excavation was by means of hoists and derricks. After the excavations were

made, the timbering was put in, which sustained the plank roadway at the surface at each curb sixteen feet in width, for the use of vehicular traffic during the progress of the work; then the cement foundation or floor of the subway was laid; afterwards the steel structure was erected; this, in turn, was coated with a jacket of concrete; the earth was refilled in the trench, and the pavement restored. It does not require an expert to understand that this entire operation could be carried on with much less expense in consecutive order. The contract and the city ordinances required that none of the dirt or material excavated be stored in the streets. The contractor was obliged to cart the same away, and it is very easy to understand that, if the work was being carried on consecutively, after the work was once under way the dirt taken from excavation to the north could be used in recovering and filling the completed work to the south. The same would apply to the timbering. As a matter of fact, the proofs show that, when the plans were finally furnished by the engineer of the Public Service Commission, they were furnished in disconnected sections, the Commission dividing up the entire work into sixteen subsections, furnishing separate plans for each. The proposed plan of operation of the plaintiff was testified to by the witness Briggs, who was the plaintiff's engineer and who continued upon the work and in charge of the same after the plaintiff obtained the services of the subcontractor to carry on said work. Briggs testified: " Well, we had a very definite plan; that is we expected or at least it was our plan to start at or near the south end of the work and make each operation at that point follow the other in a routine order; * * * the idea being that when we once started the excavation the timbering would follow it and the placing of the concrete foundation, the erection of the steel, the placing of the concrete envelope and the other incidental work in connection with the subway, like the water proofing * * * after a period of say four months had elapsed or three months from the beginning of the operations, we expected that we would have every day, every operation going continuously, just follow one thing, follow right after the other; in other words, we expected to organize the work so that a man who was excavating would be excavating every day, a man who was timbering would be timbering every day, and a man who would be erecting steel the same; a man who was concreting would concrete every day and the same with the steel, and that where a man stopped one day he would take up his work at the same point the next day; in other words it would be like a shop operation, one following the other continuously and consecutively."

The contract provided, by section No. 36, as follows: " The engineer will prepare and furnish to the contractor from time to time as required, drawings and plans amplifying such details of the contract drawings as may be necessary   *   *   *.   These plans must be strictly followed."

The contract also provided: " Generally the contractor will be permitted to conduct his work in the most expeditious manner possible, having due regard for the safety of persons and property and facilities for traffic, and under such instructions as the engineer may give from time to time."

In order that the work might be completed within the contract period of twenty-four months, it is entirely evident that the most perfect system and the utmost speed was required in prosecuting the work.   The contract further provided: " All the work shall be prosecuted in the manner, according to local conditions, best calculated to promote rapidity in construction, to secure safety to life and property and to reduce to the minimum any interference with abutting property and the public travel."

On October twenty-sixth the engineer of the Public Service Commission, who was in charge of the work in behalf of the city, gave the plaintiff written directions to proceed with its work of the construction of section No. 2.

In the subway construction work three general sets of plans or drawings were required, all of which were passed upon by the engineer's office of the Public Service Commission.   The first plans were known as the contract drawings from which the contractors made their bids.   These were furnished at five dollars a set.   After the contract was let to the successful bidder, a second set of plans, known as construction drawings, were to be furnished by the engineer of the Public Service Commission, and were known as amplified construction drawings.   With the consent of the Public Service Commission, the structural steel work was sublet by the plaintiff to the American Bridge Company for fabrication. When the amplified construction drawings were furnished by the engineer of the Public Service Commission, they were turned over by the plaintiff to the American Bridge Company, which, in turn, prepared shop drawings of the fabricated steel work.   Under the contract and practice of the parties, these drawings were in turn submitted to the engineer of the Public Service Commission, who passed upon the same, and modified, rejected or approved them. When finally approved by the engineer, they were returned to the American Bridge Company, who at once took up the fabrication of the steel work.   The evidence shows that about seven months was required, after the final steel drawings were in shape, for the

American Bridge Company to furnish the fabricated steel required in the work. The evidence shows that, instead of acting promptly and with reasonable diligence and as required by the contract, the engineer delayed furnishing the amplified drawings from which the American Bridge Company could make its shop drawings, and that thereby long and expensive delay resulted in obtaining the necessary steel. Not only this, but the order in which the plans were furnished was so disconnected as to utterly disorganize plaintiff's construction plans. As early as October 31, 1912, the plaintiff's chief engineer addressed a letter to the chief engineer of the Public Service Commission, calling attention to the congested condition of steel mills at that time, and to the fact that the contractor was very anxious to get some of the general drawings covering sections 1 and 2, so that it could forward them to the American Bridge Company and get the work under way. On November 18, 1912, plaintiff's president and chief engineer talked with the engineer of the Public Service Commission and asked to be furnished, first, with the plans commencing at the southerly end of the second section at Eighty-sixth street. On January 18, 1913, the plaintiff's engineer wrote to the chief engineer of the Public Service Commission as follows: " In providing for furnishing us with plans for fabricating and delivery of steel for subway structure on Sections #1 and #2 of Route #11-B, Brooklyn Subway, we request that the following order be observed; that the plans for Section #1 be provided, first for the southerly end of the section and thence throughout the section to the northerly end, and that the plans for Section #2 be furnished from 66th Street northward to the northerly end of the section and from the southerly end of the section to 66th Street, as this is the order which will be followed in the execution of our work."

Again, on January 22, 1913, plaintiff's secretary wrote the chief engineer of the Public Service Commission, calling attention to the difficulty in obtaining steel, and urging that the general drawings for steel work be furnished the contractor at as early a date as possible. On February 4, 1913, plaintiff's secretary again wrote the engineer, stating that work on the two sections had been commenced, both at Sixty-fifth street and at Eighty-sixth street, and that it was the contractor's plan to prosecute each section northerly, and asking to have the drawings for the work prepared in the same consecutive order, and thus facilitate the delivery of steel in the order desired. On February 8, 1913, the chief engineer of the Public Service Commission wrote the plaintiff, replying to its letters of January eighteenth, January twenty-second and February fourth, and expressing an understanding of the

general plan of the plaintiff with reference to the prosecution of the work, and said: "The designing work is being carried on as rapidly as possible, following in a general way the order suggested by you in your letter of January 18, and this program will be adhered to."

The first steel drawings that were actually furnished by the engineer of the Public Service Commission for the first or southerly section of the work were not received until June 20, 1913. In the meantime plaintiff's engineer in charge of the work had called upon the designing department of the defendant and talked with Mr. Guertz, who was then in charge of the designing of the steel drawings, and told him that the contractor was anxious to get all the drawings as soon as he could, and asked him how long he thought it would take to get them out. Briggs testified, referring to Guertz: "He said the steel drawings for sections 1 and 2 would not be completed within two months; but he thought they would be completed within three months. He said six men were constantly at work and they would not be withdrawn."

Briggs testified that he then told him that the contractor would be glad to send money to facilitate the completion of the steel drawings, and offered to hire and pay for men and put them to work under the direction of the office of the said Public Service Commission designer. This offer was not accepted by the Public Service Commission. Guertz testified upon the trial, with reference to the contractor's request for prompt plans: "Why, I was not particularly interested from the contractor's side except that those drawings were to be furnished within a reasonable time, as near as I could determine myself, unless other conditions arose, such as the contractor's request that he be furnished drawings at a certain time and in that respect the chief engineer to a certain extent, in my opinion, has always the prerogative of indicating how fast or how slow work may proceed under certain conditions. I do not wish to be understood that the chief engineer limits the contract or has limited it, but I believe he holds the prerogative of determining when, where and how work shall be done."

Interrogated with reference to the necessity of extra help in preparing the plans, Guertz was asked: "Q. You said that it was not necessary to put on any extra force because the work for the construction had not been begun? A. I said there was sufficient men available. Q. For what? A. To take up the work of making the detail drawings, construction drawings. Q. Sufficient men available who would take thirteen months; that is what you mean? A. Why, in certain propositions it might take thirty years to work out a problem. That is no criterion."

The evidence is very clear that the Public Service Commission and its employees were quite deaf to the repeated importunities of the plaintiff for speedy plans. Apparently, they considered speed no concern of theirs. As a matter of fact, the construction drawings on this contract entered into October 2, 1912, were not finally furnished complete until November, 1913, practically thirteen months from the date of the contract, and still Guertz testified that that was a reasonable time required in the preparation of such drawings. The order in which the plans were furnished for the sixteen sections into which the southern or second section of the work was divided shows with what disregard to plaintiff's rights said plans were furnished by the engineering department of the Public Service Commission. The amplified drawings for the southernmost of the sixteen sections, from Eighty-sixth street to Eighty-fifth street, were not furnished until June 20, 1913; the next section north, from Eighty-fifth street to Eighty-fourth street, were furnished April 6, 1913; the drawings from Eighty-fourth street to Eighty-second street were furnished February 25, 1913, while the next section north of that, from Eighty-second street to Eightieth street, were furnished September 5, 1913; the drawings for the next section north of this, between Eightieth street and Seventy-eighth street, were not furnished until February 25, 1913, while the next section north of that, between Seventy-eighth street and Seventy-seventh street, were furnished August 16, 1913; those for the section from Seventy-seventh street to Seventy-fifth street were furnished September 17, 1913, while those for the next section north were furnished on March twenty-sixth of the same year; the drawings for the section between Seventy-sixth street and Seventy-third street were furnished February 25, 1913, while those for the next northerly section, between Seventy-fourth and Seventy-second streets, did not come until August twentieth; from Seventy-third street to Bay Ridge, the plans came on February twenty-fifth, while the next northerly section, between Ovington and Bay Ridge avenues, were not furnished until August sixteenth; and those next north, from Ovington avenue to Senator street, on November fourth; and between Sixty-eighth street and Senator street, on March twenty-sixth; and those for the final section, between Senator street and Sixty-sixth street, were furnished on July twenty-second. It is entirely clear that in this manner plaintiff's plan of operation was entirely disorganized, and it was unable to carry on its work advantageously. Testimony was given on the part of the plaintiff that, had the plans been promptly furnished and in the order requested, the work could easily have been completed in twenty-three months from the making of the

contract. This expert testimony was not controverted by the defendant. The evidence also shows that about seven months were required after the contractor had obtained the city's steel drawings before the actual delivery of the steel could be procured. Under such circumstances it is easy to understand the pressing need of the contractor for prompt delivery " as required " of said steel drawings. Instead of furnishing the steel drawings promptly, the first of them were not furnished until eight and one-half months after the contract was made, and when so furnished, were for disjoined sections and without regard for sequence, as above indicated. Had the contractor understood that the city would delay the furnishing of the steel drawings for thirteen months, it might not have made the bid that it did, nor have agreed to complete the work within twenty-four months. The evidence clearly shows that the contractor used every effort to obtain these plans promptly, and that the engineer inexcusably and arbitrarily refused to furnish the same. It is very evident that, by reason of the manner in which the city furnished said steel drawings, the contractor was caused substantial damage, and while it is true that such damages are difficult of ascertainment, nevertheless, such fact should not deny the plaintiff the recovery of proper damages. The courts have long since adopted a reasonable rule that, where it is apparent damages have been sustained, the best available proof in support thereof may be given. Expert evidence was given upon the trial, as before stated, that the work could have been completed, if properly managed, in about twenty-three months from the making of the contract. It was proven that the actual cost of excavation, had it proceeded without interruption, would have been seventy cents per cubic yard, but that, under the confusing conditions imposed by the defendant's conduct and failure to furnish the required plans, the actual cost of excavation was $1.15 per cubic yard, or an excess over what it should have cost of forty-five cents per cubic yard. That as to the concrete work, as shown by a typical month of balanced, uninterrupted operations, the labor cost was $2.04 per cubic yard of concrete, whereas, the actual labor cost under the conditions which existed was $3.08 per cubic yard, or an excess of $1.04 per cubic yard over what it should have been. It was also shown by expert testimony upon the trial that the excess cost for installing timber, caused by the manner in which the plaintiff was compelled to do the work, amounted to $29,773; and that there was an extra cost of $25,000 for back-filling. Other extra expense and cost was proven far in excess of the amount awarded by the verdict of the jury. As before suggested, the damages were difficult of proof or exact

ascertainment, but the courts have been liberal in permitting the introduction of the best proof available where it appeared that damages had actually been sustained. (*Bates* v. *Holbrook*, 89 App. Div. 548; *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 N. Y. 205; *Dart* v. *Laimbeer*, 107 id. 664; *Drucker* v. *Manhattan R. Co.*, 106 id. 157.) The defendant offered no evidence in opposition to that submitted in behalf of the plaintiff on the question of damages. The total amount paid the plaintiff under the contract was $1,824,770.44. The jury allowed plaintiff $153,553 for delay, which is less than eight and one-half per cent of the contract price. I think that it is beyond possibility of dispute that, had the city at the time of advertising for bids for this contract, stated that the steel drawings would be furnished in the manner and at the times they were in fact furnished, it would not have obtained a bid within eight and one-half per cent of that of the plaintiff for said work. In fact, had it been known to the bidders that there was to be the delay which actually occurred, and that the plans would be so furnished in irregular and disjoined sections, it is improbable that any contractor would have had the temerity to have interposed a bid for the job. While the plaintiff undertook the performance of its contract with promptness, it claims that, owing to the dilatoriness of the defendant, it was prevented from completing its contract until June 19, 1916, when the work was finally completed and accepted by the city.

The appellant's main contention is that even though plaintiff's prosecution of the work was interfered with and hindered and delayed by the manner in which said construction drawings were furnished, nevertheless, the city should not be held liable therefor. I am unable to appreciate the force of the appellant's position in this respect. It is conceded in the appellant's brief that the Public Service Commission " is charged by law and by the contract in this case with the preparation and checking of plans for the construction of subways, and that in certain matters set forth in the contract and in the statute the engineer and his subordinates are specifically made the agents of the city for doing certain things mentioned therein. &ast; &ast; &ast; "

The contract itself was made by the Public Service Commission, in accordance with the provisions of the Rapid Transit Act. The Public Service Commission was the agent of the defendant, and the defendant contracted and agreed to furnish as required the necessary drawings. It failed in this, or, at least, it furnished them with such tardiness and in such a manner as to justify the finding of the jury, that the defendant's default damaged the plaintiff.

The city, having contracted with the plaintiff that the engineer

of the Public Service Commission would furnish these drawings, irrespective of any question of agency, cannot ·escape liability for the failure of the engineer to promptly furnish such plans. In this respect the liability of the defendant is the same as it would have been had the agreement been that any other structural engineer engaged in the practice of his profession in the city would furnish such plans as and when required. Manifestly, in either case, the city would be liable for the failure of the engineer to furnish plans as agreed. Not only for the purposes of the execution of this contract was the Public Service Commission and its engineer the agent of the city, but, aside from any question of agency, the city was bound by its contract that the engineer would furnish the plaintiff with the amplified plans required by the plaintiff. The engineer failing in this, I think the city clearly became liable for any damages resulting from such failure. (*Mansfield* v. *N. Y. C. & H. R. R. R. Co.*, 102 N. Y. 205.)

The appellant seeks to avoid liability upon the ground that the Public Service Commission is a State department and is no part of the internal management of the city; that the engineer of the Public Service Commission is not a city official nor the general agent of the city for whose wrongful acts the city can be held liable. Nevertheless, the contract was made by the Public Service Commission, pursuant to law, in behalf of the city, and the city is bound by its terms. The contract provided that the amplified construction drawings would be furnished by a certain individual, namely, the engineer of the Public Service Commission. It was primarily the duty of the city, for which the construction work under the contract was to be performed, to furnish these drawings. By law and by the terms of the contract, the performance of that duty devolved upon the engineer of the Public Service Commission. The plaintiff had absolutely no control over the city nor over the engineer required to furnish the necessary drawings. It had the right to expect, however, that the party who was lawfully selected for that purpose should act with reasonable promptness and so as not to interfere with the plaintiff's prosecution of the work. The city did not fulfill its obligation to the plaintiff in this respect. The engineer was named in the contract as the arbiter of the final construction plans, and when the engineer defaulted his default was the city's default. It seems to me an absurd proposition that the city could avoid responsibility for the acts of the engineer of the Public Service Commission when it contracted that the engineer would act in a particular way. The action is purely for a breach of the provision of the contract entered into by the city with the plaintiff that a certain

individual named by the city would prepare and furnish to the contractor, from time to time, as required, drawings and plans amplifying such details of the contract drawings as might be necessary. The jury having found that the individual, namely, the engineer of the Public Service Commission, selected by the city, as required by law, had defaulted in preparing and furnishing to the contractor such plans, the city, I think, is clearly liable for breach of its contract in this respect. I can see no sound reason why the city should be relieved from the plain provisions of *its contract* merely because, under the provisions of the statute, such contract was made for the city by another duly authorized body, namely, the Public Service Commission. The Commission legally bound the city, not only to pay the contract price, but also to keep and perform the other agreements contained in the defendant's contract with the plaintiff.

The strongest evidence of the fact that the city became liable for the acts of the engineer of the Public Service Commission is to be drawn from the provisions of article 43 of the contract. That article provides that: " If the Contractor shall claim compensation for any damage sustained *by reason of the acts of the Commission, or its agents*, he shall, within ten days after the sustaining of such damage, make a written statement of the nature of the damage sustained to the Engineer. * * * " Here we find an admission of responsibility on the part of the city for the acts of the Public Service Commission, or its agents, and that, if timely presentation thereof is made, the contractor may assert his claim for compensation against the defendant city. It seems to me futile for the city, in view of said provision of the contract, to claim that it is not responsible for the conduct of the engineer.

The appellant cites several cases holding that the city cannot be held liable for the torts of those not connected with it or its internal management. I think none of these authorities are controlling against the plaintiff's claim herein. The plaintiff's claim is not based upon the tortious act of a third party, for which the city, of course, could not be held liable, but is asserted *under the contract* and by reason of the city's breach thereof, in failing, as required, to furnish plaintiff with the amplified plans prepared by the engineer of the Public Service Commission. If the city can be held liable to the plaintiff for the payment of the contract price which the plaintiff was to receive for the work, it can just as surely be held to the performance of any other provision of the contract, and, in case of a breach thereof, is liable to plaintiff under the contract for any damage resulting from such breach. It may be that the engineer of the Public Service Commission

did act with reasonable promptness in furnishing said plans, and was not unreasonable in refusing to order the by-passing of the gas mains. Upon these questions the evidence presented sharp questions of fact, which were properly submitted to the jury by the trial court. The jury has resolved all questions of fact in plaintiff's favor, and its verdict cannot be said to be against the weight of the evidence.

As to the award of the jury as damages for by-passing, I think the evidence fully supports the verdict. The contract, I think, unquestionably provided that by-passing was one of the steps which might necessarily be taken in the prosecution of the work, and provided proper compensation to the contractor therefor. The term " by-passing " is descriptive of the operation of furnishing temporary conduits for gas mains so as to avoid the necessity of cutting off the gas supply to users, pending the construction of the subway. So much of plaintiff's claim as concerned section 1 of the work is set out in plaintiff's third cause of action, and the by-passing claimed with reference to section 2 is alleged in the sixth cause of action. The circumstances under which by-passing became necessary were as follows: In constructing the subway the street under which it ran was excavated from the surface from curb to curb to a depth of about thirty feet. The width of the excavation from curb to curb was substantially sixty feet. After the excavation was made and while the work of installing the subway structure was in progress, the contractor was obliged to maintain a roadway for travel at the street surface on both sides of Fourth avenue, each roadway being, as hereinbefore stated, about sixteen feet in width and having a two-inch plank surface. This left an opening in the center twenty-eight feet in width. Under this temporary plank roadway, for a distance on each of the two sections, there ran a twenty-inch high-pressure cast-iron gas main and also under the decking there was a sixteen-inch cast-iron gas main. By means of these mains the residents of the locality were served with gas. The pipes constituting these mains were not screwed together, but were held together by means of molten lead. The gas companies notified the contractor that it was necessary to by-pass these mains during the progress of the work, as the mains were at places left suspended in the air, and the nature of the unions of the sections of the pipe was such that they might easily become disjointed, and the gas escape. In by-passing, the gas mains were temporarily killed and temporary overhead pipes were laid through which the gas was conveyed during the time when the work was being prosecuted and until service through the original pipes could be safely resumed. The proof shows clearly

that it would have been dangerous to life and property to have continued to use the cast-iron mains, and that it was essential that a by-passing method should be adopted. To accomplish this 10,421 feet of twelve-inch wrought-iron piping was used. The contract provided a unit price for such twelve-inch piping of $3 per lineal foot, for which the jury allowed the contractor the unit price, amounting to $31,263. The exact figures of the amount of piping used by the contractor for by-passing was furnished by the witnesses for the defense. Subsequently to the rendition of the verdict the court ordered that interest, as aforesaid, be added to said sum which the jury allowed.

It is the contention of the appellant upon this appeal that said by-passing was unnecessary and was not directed to be done by the engineer in charge. The appellant relies in this respect upon section No. 52 of the contract, which provides that wherever the excavations are decked, all gas pipes whose service cannot temporarily be dispensed with shall be by-passed, if directed by the engineer, temporary pipes to take their place being laid either upon or below the street or sidewalk surfaces. The engineer refused to direct the by-passing of said gas mains. Nevertheless, by article 10 of the contract it is provided that in order to construct the railroad it would be necessary to protect, support and maintain during construction all water mains, *gas pipes*, electric subways and other surface, subsurface and overhead structures, together with their necessary connections, as the same might be met with along the route, and to move, alter, readjust or rebuild water mains, gas pipes, etc. Said article 10 of the contract further provided as follows: " All such work of every description, including under-pinning wherever necessary, of all buildings or structures of whatsoever nature, monuments, and surface and sub-surface railroads affected by or interfered with during the construction of the railroad, is a part of the work which is included in this contract and which the contractor agrees to perform for the price herein agreed upon."

The contract particularly provided that the contractor should complete the entire work in the most workmanlike manner, and with the highest regard to the safety of life and property. The officials of the Kings County Lighting Company, owning and maintaining said conduits, wrote the plaintiff that the mains in question must be by-passed, calling attention to the danger to life and property in case this were not done. Repeatedly letters to the same effect were written by the officials of the lighting company to the contractor. The plaintiff's chief engineer sought to place the responsibility for directing the same upon the engineer

of the Public Service Commission. On December 24, 1912, the defendant's division engineer wrote the plaintiff to the effect that complaint had been made by a representative of the Kings County Lighting Company that in excavating near Sixty-sixth street the twenty-inch gas pipe had been struck a number of times so severely as to subject it to danger of breakage. The letter addressed to the chief engineer of the plaintiff concludes: " Will you please see that every proper precaution is taken to maintain this pipe safely, as required by the contract, so as to avoid giving grounds, however small, on which to base a complaint of this kind." Finally, on January 15, 1913, the defendant's chief engineer wrote the chief engineer of the plaintiff with reference to by-passing these gas mains: " It is not my intention to order these gas mains by-passed and for that reason I have written both of these companies that the contractor is obligated under his contract for these sections to care for and maintain all mains found in the street. If it is the opinion of the gas companies that these mains should be by-passed it was suggested that they confer with you, and it was also suggested that your method of prosecuting this work might meet with their ideas as to the care these mains should receive."

It would seem from the above-quoted portion of the engineer's letter that he understood that a duty was upon the contractor to do whatever was necessary in the premises. The subsequent correspondence between the engineers shows conclusively that the Public Service Commission understood that said by-passing was to be accomplished, although the engineer did not expressly direct the same to be done. The contract itself, in article 11, in its schedule of unit prices, provided that the contractor should receive: For twelve-inch by-passing pipe, the sum of three dollars per lineal foot. It would seem, therefore, that the furnishing of this by-passing pipe for which the jury have allowed the contractor was a part of the work contemplated by the parties and necessarily done in the execution of the contract. While one section of the contract would seem to indicate that the by-passing was to be directed by the engineer, such section does not relieve the contractor from responsibility for by-passing the conduits when actually required. When the engineer refused to direct the by-passing of the gas pipes, the contractor was left to his own resources, and was called upon to determine whether he should leave the mains unprotected and in danger of being broken with resulting loss of life and property, or should adopt the other course, which prudence suggested. Unquestionably, from the correspondence the contractor was convinced that the by-passing was necessary. If the company's cast-iron mains became disconnected air would

enter and mix with the gas, resulting in a highly explosive combination, which would endanger life and property, not only to those engaged in work upon the subway, but to the gas users themselves. The testimony was overwhelmingly to the effect that to leave the cast-iron pipes as conduits for the gas without by-passing would be extremely dangerous. The contractor, under article 10 of the contract, was called upon to do " such additional and incidental work as may be necessary for the completion of the railroad." " To protect, support and maintain during construction * * * water mains, gas pipes, electric subways, poles and wires * * * together with their necessary connections, as the same may be met with along the route." I, therefore, think the jury very properly allowed the contractor the unit price of three dollars per foot for the 10,421 lineal feet of twelve-inch pipe necessarily used by the contractor in by-passing said gas mains. While the contract provided that upon the direction of the engineer all gas pipes whose service could not temporarily be dispensed with where the excavations were decked, should be by-passed, still such express provision did not relieve the contractor from by-passing wherever it was necessary in order to complete its contract. The court left it to the jury to determine upon the evidence whether it was, in fact, necessary to by-pass the gas mains. The jury, by their verdict, found that the by-passing was necessary, and returned a verdict in plaintiff's favor therefor.

I think the allowance of interest upon this claim was entirely proper. The defendant was aware of the amount of pipe necessarily used in effecting such by-passing. Indeed, the figures upon which the jury based its verdict were furnished by the defendant's engineers. The contract itself provided the unit price for the twelve-inch pipe used in such by-passing. It was, therefore, at all times entirely within the power of the defendant to compute the amount due the contractor for such by-passing, and this being so, the plaintiff was entitled to interest upon its claim therefor. (*Degnon-McLean Co.* v. *City Trust Co.*, 99 App. Div. 195; affd., 184 N. Y. 544; *Sloan* v. *Baird*, 162 id. 327; *Sweeny* v. *City of New York*, 173 id. 414.) In *Sweeny* v. *City of New York* (*supra*) the referee awarded interest upon the plaintiff's claim. The Appellate Division disallowed the same (69 App. Div. 80), and the Court of Appeals reversed the Appellate Division and reinstated the interest.

I do not think there is any force in the appellant's contention that the plaintiff cannot recover by reason of the fact that it sublet the construction of the subway to the firm of Carpenter & Boxley. As a matter of fact, the plaintiff employed Carpenter & Boxley to perform the work upon an agreement that Carpenter

& Boxley should receive ninety-two per cent of each and every of the amounts which should become payable to the plaintiff under and pursuant to said contract. This hiring of Carpenter & Boxley, or subletting, if it may be called such, was not authorized or approved by the defendant or the Public Service Commission. The contract itself prohibited a subletting, except with the written approval of the Public Service Commission. By the 8th article of the contract it was provided that the contractor, before making any subcontract of the work, should state in writing to the Commission the name of the proposed subcontractor, the portion of the work which such subcontractor was to do or the materials which it was to furnish, its place of business, and such other information as the Commission might require. Nothing of the sort was done, but the contractor, in effect, hired Carpenter & Boxley to do the work for ninety-two per cent of the moneys paid upon the contract. The appellant contends that the work having been performed by the subcontractor, it alone was entitled to sue for damages. The fallacy of such position is at once apparent when we consider that the subcontractor had absolutely no connection with the city or the Public Service Commission. The subcontractor was powerless to seek relief from the city, or to sue it under the contract. The appellant relies upon the case of *City of New York* v. *Selden* (255 Fed. Rep. 317) in support of its contention in this respect. In that case the action was brought for an affirmative wrongful act against the subcontractor, and it was held that the subcontractor had a right of action against the city. This action is not for an affirmative independent act on the part of the city, but is brought for damages under the contract itself. The only party that could seek such damages was the party with whom the city contracted, namely, the plaintiff. The claim here is for damages by reason of the city's failure to comply with the duty and obligation which it assumed under the contract of supplying the contractor with the necessary steel drawings. Carpenter & Boxley were in no position to bring suit against the city for its failure in this respect. Had an attempt been made by them to collect from the city, the city's answer would at once have been that it was under no obligation to furnish the subcontractor with the steel drawings, and its position in this respect would have been unassailable. The mere fact that the contractor was able to make an advantageous arrangement with Carpenter & Boxley is no concern of the city. Whatever the result of its contract with Carpenter & Boxley was, the city was not interested. The city never recognized Carpenter & Boxley in the transaction, but all payments were made and all negotiations

27

had with the plaintiff. The plaintiff, under its contract with Carpenter & Boxley, agreed to pay them ninety-two per cent of the amounts payable to it under the contract " as and when such payments are made by the City of New York to the Degnon Company." Under such language there is clearly an implied duty on the part of the Degnon Company to prosecute and collect from the city such damages as are due in the course and performance of the work. In these damages Carpenter & Boxley are concerned, and to the extent of eight per cent thereof, at least, this plaintiff is concerned. Inferentially, if authority was necessary to be shown, the language of the contract between the plaintiff and Carpenter & Boxley implied an authority from Carpenter & Boxley to the plaintiff to enforce such collection. The principle that a defendant may not invoke for his benefit independent advantages or arrangements made by the plaintiff for the plaintiff's benefit is exemplified in many cases where defendants seek by way of defense to avail themselves of insurance secured by a plaintiff for his protection. (*Merrick* v. *Brainard*, 38 Barb. 574; affd., *sub nom. Merrick* v. *Van Santvoord*, 34 N. Y. 208; *Carpenter* v. *Eastern Transportation Co.*, 71 id. 574; *Propeller Monticello* v. *Mollison*, 58 U. S. [17 How.] 151.)

The appellant also claims that the plaintiff's recovery is barred by its failure to present its claims for damages in conformity with article 43 of the contract. The article mentioned requires the contractor, if it claims compensation for any damage sustained " by reason of the acts of the Commission or its agents," within ten days after sustaining such damage, to make a written statement of the nature thereof to the engineer, and that on or before the fifteenth of the month succeeding that in which any such damage shall have been sustained the contractor shall file with the engineer an itemized statement thereof, or otherwise forfeit its claim. The article expressly refers to damages sustained " by reason of the acts of the Commission or its agents." Strictly, the damages claimed by the plaintiff herein are not by reason of the acts of the Commission or its agents, but are by reason of the said engineer's failure to act. Moreover, the damages involved in the delay claim were of a continuing nature, and unascertainable until the work was completed sometime in January, 1916. On January 12, 1916, the defendant was advised of the claim, and on January 31, 1916, an itemized statement thereof was rendered. It would have been a practical impossibility for the plaintiff to have stated the items of its damage each month it was delayed in the performance of its contract. Just what damage the plaintiff sustained by reason of the delay would be impossible of ascertainment

until the work was completed, when, adopting the method permitted by the court upon the trial, the damages which the plaintiff suffered were capable of ascertainment. It would be a most unreasonable construction of the contract to hold that it required more. The law favors that contracts be reasonably, and not unreasonably, construed. Under such circumstances, I do not think the plaintiff's claim is barred.

There is no basis whatever for the defendant's claim that, the contract having provided a remedy to the contractor, in case the work was delayed, in the shape of an extension of time to complete the work, it was, therefore, not entitled to damages for delays.

I do not think there is any force in the appellant's position that the request for and acceptance of extensions by the contractor to complete the work worked any waiver of damages by reason of delay. If the defendant violated its contract by the delay complained of, it could not complain that additional time was required for the performance of the work, and in asking such extension the contractor did not waive his right to damages resulting from the defendant's wrongful acts.

The manner in which the court submitted the case to the jury, I think, was eminently fair. But a single exception was taken by the city to the charge of the court. Counsel for the plaintiff asked the court to charge as follows: " I ask your Honor to charge if in order to fairly and reasonably fulfill its obligations to the contractor with respect to the furnishing of steel drawings, it was necessary for the city to have proceeded with and advance the preparation of such steel drawings before the time for the signing of the contract, then it was the duty of the city so to do."

To this request the court acceded, and counsel for the defense excepted. Manifestly, there was no error in such instruction. The contractor was allowed but twenty-four months to complete this gigantic work. Time was specified as of the essence of the contract. The city knew that only under the most favorable conditions could the contractor hope to complete the heavy task within the allotted time. The construction plans, from which the shop plans for the steel work were to be prepared, were to be furnished by the engineer of the Public Service Commission. The contractor took no part in their initiation. No reason is apparent why such construction plans could not have been prepared in advance. The Public Service Commission was as well aware of what plans were necessary before the contract was let as after. Knowing, as the engineer testified, that the preparation of such plans would require many months, reasonable prudence would have required advance work thereon. It is conceivable that the full

period within which the plaintiff was to perform its contract might be required in the preparation of the construction drawings. Indeed, Guertz, the designer of the Public Service Commission, when interrogated as to the time required to make said drawings, testified that " it might take thirty years to work out a problem." Therefore, it might well be that the city should have proceeded with the preparation of said plans in advance of the execution of the contract. All that the court was asked to charge the jury was that: " If, in order to fairly and reasonably fulfill its obligations to the contractor with respect to the furnishing of said drawings, it was necessary for the city to have proceeded with and advance the preparation of such steel drawings before the time of the signing of the contract, then it was the duty of the city so to do." Clearly, under the evidence, such instruction was pertinent and proper, and the court did not err in granting plaintiff's request to so charge the jury.

In submitting the question of delay to the jury the charge of the court was eminently fair. The court charged:

" Whether or not the delay of the engineer of the Public Service Commission to furnish the plans required to the plaintiff was due to the contractor's manner and method of prosecuting the work is also a question which the jury must determine on the facts, and if the jury should find that the delay was due to the contractor's method rather than the failure to receive the plans in sequence, then the plaintiff is not entitled to damages for delay in the performance of this contract.

" Assuming that you find that the delay was due to the City's omission to furnish the plans in sequence, that alone would not make out or establish the plaintiff's claim for damages. It must also establish to your satisfaction by the preponderance of evidence that it was the delay of the City or its officials that actually caused the delay and that the damage was suffered only because of the delay and arose directly and proximately out of the City's delay, to the contractor's pecuniary damage, and, even when you so find you will have to go still further and determine what the amount of damage was and is."

Such charge, it seems to me, was entirely correct, and within the rule laid down in *Uvalde Asphalt Paving Co.* v. *City of New York* (196 App. Div. 740).

The judgment and orders appealed from should be affirmed, with costs.

Judgment and orders reversed and a new trial ordered, with costs to appellant to abide event. Settle order on notice.